UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN GEORGE K., | ) |
| | ) |
| Plaintiff, | ) No. 18 cv 3639 |
| | ) |
| v. | ) Magistrate Judge Susan E. Cox |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kevin George K.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability benefits. Plaintiff has filed a Memorandum in Support of Reversing the Decision of the Commissioner of Social Security [dkt. 14], which we construe as a motion for summary judgment; the Commissioner has filed a cross-motion for summary judgment [dkt. 15]. As detailed below, the Court grants Plaintiff's motion for summary judgment [dkt. 14], denies the Commissioner's motion for summary judgment [dkt. 15], and remands this matter for further proceedings consistent with this Memorandum Opinion and Order.

I. Background

   a. Procedural History

In September 2014, Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), alleging disability beginning May 30, 2013. [Administrative Record ("R.") 18.] After his applications were denied initially and on reconsideration, Plaintiff requested an administrative hearing. [R. 18, 125-26.] In October 2016, Plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge ("ALJ") Gregory Smith. [R. 38-81.]

---

[1] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

A vocational expert ("VE") also testified. *Id.* On February 22, 2017, the ALJ determined that Plaintiff was not disabled. [R. 143-44.] On April 2, 2018, after a review of the ALJ's decision, the Appeals Council issued a decision affirming that Plaintiff had not been under a disability from his alleged onset date to the date of the ALJ's decision. [R. 4-7.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff filed an action in this court on May 23, 2018, seeking review of the Commissioner's decision.

   b. **Relevant Medical Background**

Plaintiff was born in May of 1963 and was 49 years old on his amended alleged disability onset date. [R. 40-41, 294.]

In June 2011, Plaintiff injured his low back at work while lifting a box of tiles that weighed 60 to 80 pounds. [R. 526.] After initially seeing his family physician, he began seeing orthopedist Richard Lim, M.D., and neurologist T. Hurley, M.D., as well as engaging in physical therapy. [R. 460-72, 498-507, 512, 520, 526.] From August 2011 to February 2012, Plaintiff underwent physical and occupational therapy, but showing decreased strength and range of motion. [R. 329-456, 526.] Plaintiff's October 2011 MRI results showed two tiny herniated discs; a tear; moderate arthropathy (joint disease); mild foraminal stenosis (narrowing of the cervical disc space caused by enlargement of a joint); and mild central canal stenosis. [R. 475-76.] By May 2012, treating orthopedist Dr. Lim opined that Plaintiff remained in constant daily pain and was limited to working four hours daily with other restrictions, including a ten pound lifting limit. [R. 461, 502-04.] Also, in May 2012, Dr. Hurley opined that Plaintiff could lift five to ten pounds, but required the option to change positions as needed. [R. 512.] In August 2012, Plaintiff visited the emergency room for an acute exacerbation of back and leg pain. [R. 601.] In August and December of 2012, Dr. Hurley noted some sensory abnormality and continually increasing back and right leg pain despite narcotic pain medication.[2] [R. 624-31.]

---

[2] Plaintiff testified, however, that he tried to limit his narcotic pain medication use because of perceived liver problems. [R.64.]

In February 2013, Dr. Hurley reported that MRI results continued to show disc collapse with degeneration. [R. 635.] In August 2013, Dr. Hurley noted that the option of surgery had been discussed, but "could not argue" with Plaintiff's decision not to elect surgery given the risk of surgery worsening his condition or not helping him. [R. 639-41.] Also in August, Plaintiff again sought emergency treatment for an acute exacerbation of back pain. [R. 591-93.]

In an October 2014 Medical Source Statement, Dr. Hurley noted that Plaintiff had disc degeneration based on his MRI; Plaintiff also had sensory loss, muscle weakness, and positive straight leg raising.[3] [R. 663-64.] Dr. Hurley opined that Plaintiff could walk one block, sit 45 minutes at a time, and stand 45 minutes continuously; needed to shift positions at will; required periods of walking around during the workday; needed unscheduled breaks; would experience good and bad days; and was likely to be absent from a job about four days per month. [R. 663-66.]

In January 2015,[4] Dr. Morris-Christian noted Plaintiff's increased asthma difficulties, despite a 10 year history of asthma. [R. 721-22.]

In February 2015, Plaintiff was treated in the emergency room for seizure-like activity, hospitalized for several days, and discharged on anti-seizure medication. [R. 676-713, 680.] During hospitalization, x-rays showed significant degenerative joint disease of the right hip. [R. 685, 712-13.] A CT scan of the lumbar spine demonstrated disc degeneration with bilateral foraminal stenosis. [R. 705.] Additional imaging revealed a right thigh mass, and Plaintiff was told to follow up with an oncologist.[5] [R. 709, 730.] The next month, Plaintiff continued to have dizziness and headaches as well as hip pain, and abnormal liver scans. [R. 728-29, 734, 830.] April 2015 notes demonstrate Plaintiff had limited hip motion and limped when walking. [R. 1068-69.]

---

[3] A positive result during a straight-leg raising test "indicates nerve root compression or impingement." 908450 straight-leg raising test, *Stedman's Medical Dictionary* (November 2014).

[4] The medical records from January 2015 onward, while briefly discussed in this Relevant Medical Background section, will be analyzed in greater detail in Section III of this Memorandum Opinion and Order, *infra*.

[5] Plaintiff later had this benign mass biopsied and removed. *See* fn. 10, *infra*.

From June 6 to June 10, 2015, Plaintiff was hospitalized for more seizure-type activity, with headaches, dizziness, and blurred vision. [R. 852-90.] Medical records from this time detail that since his prior seizure-related hospitalization, Plaintiff had at least two episodes where he had passed out or almost passed out. [R. 861.] The records note that Plaintiff had headaches daily usually lasting hours at a time and decreased in severity with medicine and a cold compress. [R. 853.] His headaches were accompanied by sensitivity to both light and sound (photophobia and phonophobia, respectively). [R.861.] His tilt table test showed hypotension (low blood pressure) on prolonged standing, and he was advised to avoid the same. [R. 861.]

Also in June 2015, Dr. Morris-Christian noted Plaintiff's continued problems with asthma and blacking out. [R. 737-38.] Plaintiff also saw a cardiologist for his syncope (fainting) and near syncope. [R. 1005-08.] EEG and nerve conduction studies showed lumbar radiculopathy, and neurology notes continued to demonstrate dizziness, syncope, vertigo, and seizure activity. [R. 762, 765, 767, 769, 790.]

In January 2016, Dr. Morris-Christian noted that Plaintiff's asthma was not doing well and he sometimes needed both his inhalers and a nebulizer treatment. [R. 748.] In March 2016, Dr. Aronson noted that Plaintiff's asthma was still poorly controlled. [R. 968.] In May 2016, Plaintiff still reported recurrent dizzy spells and near syncope on standing up. [R. 1020-22.] In August 2016, Dr. Aronson's clinic reported sleep issues. [R. 978.] Also in August, Plaintiff's neurologist noted Plaintiff's continued difficulties with headaches, dizziness, blurred and double vision. [R. 1033-36.]

    **c.**    **The Decision of the Appeals Council**[6]

On February 22, 2017, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 18-30.] On April 2, 2018, after a review of the ALJ's decision, the Appeals Council issued a decision affirming that Plaintiff had not been under a disability from his alleged onset date to the date of the ALJ's decision. [R. 4-7.] The Appeals Council adopted much of the ALJ's decision, including the

---

[6] The Court limits its factual recitation of the Decision of the Appeals Council relevant to the analysis provided in the instant Memorandum Opinion and Order.

4

functional capacity evaluation, finding that Plaintiff had the residual functional capacity[7] to perform a reduced range of light work, in that:

> he could occasionally balance, stoop, kneel, crouch, crawl, as well as climb ramps and stairs, but he could never climb ladders, ropes or scaffolds. He could frequently be exposed to unprotected heights, moving mechanical parts, extreme cold and vibration. He required the opportunity to alternate sitting and standing at will.

[R. 4-5.]

In key part when determining Plaintiff's residual functional capacity, the ALJ (and, necessarily by adoption, the Appeals Council) assigned "great weight" to the opinions of the Agency non-examining reviewing physicians, Dr. Richard Bilinsky and Dr. Reynaldo Gotanco, who both opined that Plaintiff could perform light work with various exertional limitations. [R. 27-28.] On February 2, 2015, Dr. Gotanco completed his review; Dr. Gotanco only considered medical evidence from 2012 and 2013, and one note from 2014. [R. 87-90.] Dr. Bilinsky completed his review on July 20, 2015; Dr. Bilinsky considered the exact same medical evidence considered by Dr. Gotanco, save for noting that Plaintiff had "history of seizure 2/24/2015".[8] [R 102-05, 104.] Additional medical evidence from 2015 onward was not yet in the Agency record. [R. 667-1069.]

## II. Standard of Review

This Court must review the final decision of the Commissioner of the Social Security Administration to ensure her decision was supported by substantial evidence. *Young v. Secretary of Health & Human Services*, 957 F.2d 386, 388 (7th Cir.1992); *Ray v. Bowen*, 843 F.2d 998, 1001 (7th Cir.1988). The Commissioner has delegated his authority to make final decisions to the Appeals Council. 20 C.F.R.

---

[7] Residual functional capacity is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

[8] The Court finds it extremely troubling that the two state agency physicians' opinions, which are about 4 single-spaced pages each, mirror each other *word for word*, save for one sentence about environmental limitations. [*Compare* R. 87-90 at 89 *with* R. 102-05 at 104.] In fact, both reviews even misspell the phrase "tieing shoes." [R. 89, R. 104.] This bears all the hallmarks of these Agency reviewers "rubber stamping" their opinions of Plaintiff's limitations. Additionally, the Court notes that Dr. Gotanco misstates the date of Plaintiff's seizure onset as 2/24/2015 when it was actually a day earlier on 2/23/2015. [R. 685.]

§§ 404.900, 404.981, 416.1400, 416.1481. Therefore, we review the Decision of the Appeals Council rather than the decision of the ALJ. *Bauzo v. Bowen*, 803 F.2d 917, 921 (7th Cir.1986); *see also Khang v. Halter*, 2001 WL 34373160, at *5 (W.D. Wis. May 1, 2001), aff'd sub nom. *Khang v. Barnhart*, 34 F. App'x 732 (Fed. Cir. 2002) ("[t]he question for judicial review then becomes whether the decision of the Appeals Council is supported by substantial evidence, not whether the ALJ was correct in the first place."). To the extent the Decision of the Appeals Council adopts the ALJ's decision, then the ALJ's decision is reviewed to the extent adopted. *Jackson v. Sullivan*, 1992 WL 142614, at *1 (N.D. Ill. June 10, 1992) (citing *Arbogast v. Bowen*, 860 F.2d 1400, 1402-03 (7th Cir.1988)).

For purposes of this review, substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing the Commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

III. **Discussion**

Plaintiff complains of several errors within the Decision of the Appeals Council. Among the errors alleged is that Plaintiff's functional limitations were not supported by substantial evidence, largely because the reviewing Agency physicians, Drs. Bilinsky and Gotanco, did not have access to new, significant medical diagnoses rendered after their review that could have changed their opinions. We agree and remand on this basis.

In *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016), the Seventh Circuit held that the ALJ erred in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical

6

evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." Recently, the Seventh Circuit reiterated the rule: "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018); *see also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding after ALJ failed to submit new MRI to medical scrutiny); *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) (plaintiff's "strongest argument" was that ALJ should not have credited opinions of state-agency physicians because they did not review 70 pages of key medical records that later became part of the administrative record).

Like in *Moreno*, Plaintiff's medical records "reveal significant and new developments in [Plaintiff's] health that could have affected [the physician's] assessment." *Moreno*, 882 F.3d at 728. We, too, focus on those aspects of the later-dated treating physician's opinions that Drs. Bilinsky and Gotanco never considered where the contrast is most stark.

There are nearly 400 pages of medical records the state-agency physicians never considered in this case. [R. 675-1069.] While Dr. Gotanco ostensibly reviewed (*see* fn. 8, *supra*) more of Plaintiff's medical records than Dr. Bilinsky because he completed his review later, there are still in excess of 300 pages the Court does not believe Dr. Gotanco had the opportunity to review because they were not in the record at the time he completed his review. [R. 734-1067.][9]

Therefore, we now set forth in more detail the diagnoses and impressions from the medical records that postdate the reviews completed by state-agency physicians Drs. Gotanco and Bilisky.

On January 22, 2015, Plaintiff saw his doctor for a physical, where he complained about having

---

[9] At the conclusion of the Administrative Hearing in this matter, the record was held open for Plaintiff's counsel to obtain and submit additional, recent medical records [R. 80], and the Court Transcript Index at the beginning of the Administrative Record in this case indicates that the medical records labeled R. 734-1067 were supplied by Plaintiff's counsel. The Court believes R. 1068-69 were also supplied after the conclusion of the Administrative Hearing because they appear at the very end of the Administrative Record.

7

trouble with his asthma, because it "kicks up every winter when it gets cold." [R. 721-22.] Plaintiff noted that he had been diagnosed with asthma 10 years prior and that he had been "on an albuterol inhaler and something else but he has not taken that in a while." [R. 721.] In response to Plaintiff's complaints of chest tightness, trouble catching his breath, coughing, and occasional wheezing, he was given a prescription for an albuterol inhaler for rescue relief only. [R. 722.]

On February 23, 2015, Plaintiff had a seizure at the grocery store and was taken by ambulance to the emergency room, where it was noted that Plaintiff had "no previous seizure history with new onset seizure activity." [R. 677, 685, 716.] This same medical record diagnosing Plaintiff with seizure activity also notes that Plaintiff also has new-onset lateral hip pain that "seems to hurt with some internal/external rotation of the hip…he had previously not had hip pain before." [R. 685, 734.] These records go on to note that "patient had a seizure today and fell. Complains of right hip pain down into the leg," and impressions from imaging done indicate that "[t]here is irregularity of the right femoral head which could be degenerative although a subtle fracture is difficult to completely exclude." [R. 704, 707.] The imaging did, however, show significant degenerative joint disease of the right hip. [R. 685.] Following the inconclusive x-ray, an MRI was performed, which excluded a fracture but demonstrated fluid collection in Plaintiff's right iliopsoas tendon. [R. 680.] The clinical impressions ultimately diagnosed a "5 cm avidly enhancing right intramuscular adductor muscle mass" and excision was recommended because it could not be determined if the mass was a nerve sheath tumor or a low grade sarcoma.[10] [R. 709.] Plaintiff was discharged on Keppra, an anti-sezure medication. [R. 680.]

On March 17, 2015, Plaintiff had a follow-up doctor's visit after his seizure the prior month. [R. 734.] He reported that "[h]e has had headaches and dizziness since the seizure," and he was "[s]till having a lot of hip pain." *Id.* With respect to his seizures, Plaintiff was referred to a neurologist for

---

[10] Records indicate that Plaintiff had an April 14, 2015 biopsy of the right posterior thigh mass which was an "atypical schwannian neoplasm" and confirmed "the diagnosis of a nerve sheath tumor." [R. 1001; R. 833-42 at R. 839.] Plaintiff later had this benign mass removed. [R. 1002-02; R. 737, 864.]

8

further evaluation. [R 735.] Plaintiff was also referred to orthopedics for further evaluation and treatment because imaging of his hip showed a labral tear. *Id.*

On April 1, 2015 Plaintiff was evaluated by orthopedist Dr. Aribindi, who noted that Plaintiff presented with "complaints of RIGHT hip pain after a fall due to seizures in February." [R. 1068-69.] Plaintiff noted pain in his right hip with weightbearing and ambulation, and had a limp on ambulation. [R. 1068.] Dr. Aribindi "recommended walking with use of a cane on the LEFT side." *Id.*

On June 6, 2015, Plaintiff was again admitted to the hospital for several days with dizziness, headaches, and blurred vision, and was diagnosed with "syncope and collapse." [R. 852-920 at R. 852.] Plaintiff's chief complaint was that he kept on passing out; he reported the duration as months long, but it was worse the week he decided to present to the emergency department. [R. 853, 861, 863.] Plaintiff also reported longstanding headaches, and the emergency department notes indicate that these headaches were "possible post concussive in nature from months ago" (*i.e.*, his February 23, 2015 seizure). [R. 856.] Plaintiff's EEG "could be deemed consistent with a seizure disorder, although not diagnostic." [R. 784, 861.] His tilt table study results showed hypotension on prolonged standing, and Plaintiff was advised to avoid prolonged standing and to be well-hydrated. [R. 890, 737, 1048.] Plaintiff's neurologist, Dr. Zalkowitz, noted that "[i]n the past, [Plaintiff] had been on Keppra (anti-seizure medication), during which time he had no events and then stopped taking Keppra and the events recurred."[11] [R. 784.]

On June 19, 2015, Plaintiff again followed up with his general physician regarding his asthma. [R. 737-38.] He reported that "[h]is asthma bothers him 4 or more nights per week." [R.737.] Plaintiff also reported that his neurologist, Dr. Zalkowitz, had diagnosed him with "undetermined seizure

---

[11] The record conflicts as to the reasons for Plaintiff's cessation of Keppra; in May of 2016, the record notes that "[i]n November 2015, he cut down Keppra to 500 mg a day because he had difficulty with sleeping and he thought it was from medication," but a June 2016 record reflects that Plaintiff "stopped Keppra after he ran out of it." [R. 1023, 1005.] Either way, the record reflects adverse effects after the cessation of Keppra, including but not limited to "headache, dizzy spells, and sometimes dropping to his knees." [R. 1023.]

9

disorder." *Id.* Plaintiff was again advised to "remain hydrated and avoid prolonged standing." [R. 738.] He again presented to his general physician on August 13, 2015, feeling that his asthma was not well-controlled. [R. 740.] However, the record indicates Plaintiff had been noncompliant with his asthma medication regimen. [R. 741.] When Plaintiff next saw his general physician for an asthma follow-up on September 30, 2015, he reported that his asthma was well controlled since he became compliant with his medication regimen. [R. 743-44.] Unfortunately, on January 11, 2016, Plaintiff reported that his asthma was aggravated by the cold weather and he had been using his rescue inhaler 3-4 times per week for at least the prior 4 weeks. [R. 745.] His asthma was again not doing well on January 26, 2016 when he reported that he needed his rescue inhaler 1-2 times per day. [R. 748.]

Plaintiff was referred to a pulmonary consultant in March 2016 due to his poorly-controlled asthma. [R. 966-69.] That consultant, Dr. Aronson, noted that Plaintiff's asthma problems are the result likely the result "of the fact that he lives in an old, musty apartment and the landlord has been unresponsive in addressing the mold issues." [R. 966, 968.] Dr. Aronson further identified that Plaintiff was using an improper technique to administer his inhalers, which was also part of the issue. [R. 966.] Dr. Aronson also reconfirmed Plaintiff's symptoms of presyncope leading to syncope "when he is on his feet for a long time or rises quickly." [R. 969.] In April 2016, July 2016, and August 2016, Plaintiff reported to Dr. Aronson and colleagues that he gets short of breath quite often and still needed his rescue inhaler multiple times per day. [R. 970, 973, 977.] In August 2016 he also reported waking with headaches, and described experiencing symptoms of hypersomnia.[12] [R. 977-78.]

On August 22, 2016, Plaintiff reported to his neurologist that he was still experiencing "headache, dizziness, blurred vision, double vision on and off." [R. 1033.] Plaintiff was put back on a 500 mg dosage of Keppra twice a day to control his seizure disorder symptoms. [R. 1036.]

At the October 13, 2016 administrative hearing, Plaintiff testified that his back pain radiated

---

[12] Hypersomnia is "[a] condition in which sleep periods are excessively long, but the person responds normally in the intervals." 426050 hypersomnia, *Stedman's Medical Dictionary* (November 2014).

10

down his right leg, and he had leg numbness especially with longer periods of sitting. [R. 54-55, 59-60.] Plaintiff also testified he used a cane "all the time" for any walking that took longer than 5 minutes, and he expected he would need his cane at a job that required him to stand for more than 15 minutes at a time. [R. 64-65.]

The state-agency physicians did not have the opportunity to review *any* of the aforementioned medical information, which, in the Court's opinion, reveals significant, new, and potentially decisive developments in Plaintiff's health that could have affected both physician's assessments.[13] *Moreno*, 882 F.3d at 728; *Stage*, 812 F.3d at 1125. Specifically, Plaintiff had no history of seizure prior to his February 23, 2015 seizure, and then he was continually treated, monitored, and tested for various syncopal episodes and other seizure symptoms (including persistent headaches) thereafter through the date of the administrative hearing. A seizure disorder is not an insignificant medical issue, particularly if it is not well controlled and an individual is having recurring syncopal episodes, as Plaintiff's was. Plaintiff was even advised by his neurologist and other treating physicians to avoid prolonged standing. The seriousness of Plaintiff's syncopal episodes is evidenced in particular by the medical note reflecting that in June of 2016, Plaintiff was advised that "under Illinois State Law, he is unable to drive for 6 months due to his syncopal episode." [R. 861.]

Next, Plaintiff's right hip issues also began on the date of his February 2015 seizure. Ultimately, imaging showed a labral tear and significant degenerative joint disease of the right hip. [R. 685, 735.] Over a month later, Plaintiff was still walking with a limp and had pain in his right hip when weight bearing, which caused his orthopedist to recommend the use of a cane. [R. 1068.] Plaintiff testified in October 2016 he was still using a cane "all the time" for any walking that took longer than 5 minutes. [R. 64-65, 58.] Neither of the state-agency physicians mentioned a cane, nor did the ALJ or the Appeals

---

[13] While Dr. Bilinsky's July 20, 2015 review makes brief reference to Plaintiff's "history of seizure 2/24/2015" [R. 104], it is not clear which records Dr. Bilisky reviewed that contained this information, nor are we certain these medical records were part of the Administrative Record at the time of Dr. Bilisky's review. *See* fn. 9, *supra*.

11

Council,[14] but hip problems severe enough to require the use of a cane is certainly something likely to have an impact on an individual's functional limitations assessment.

Plaintiff's asthma, on the other hand, appears to be somewhat of a red herring as far as evidence that would qualify as new and significant such that it would have necessarily altered the conclusions of the state-agency physicians. Plaintiff's asthma diagnosis certainly wasn't new; records indicate Plaintiff had been diagnosed with asthma 10 years prior to 2015.[15]

Because the new, significant evidence of Plaintiff's seizure disorder and associated symptoms as well as his hip problems and cane usage bears directly on the functional limitations assessments state agency reviewers are asked to make, this evidence certainly could have altered Dr. Gotanco's and Dr. Bilinsky's conclusions regarding the existence and severity of Plaintiff's medical conditions. *Stage*, 812 F.3d at 1125; *Moreno*, 882 F.3d at 729. This evidence "changed the picture" of Plaintiff's health so much that the ALJ erred by continuing to rely on outdated assessments by non-examining physicians Drs. Gotanco and Bilinsky. *Stage*, 812 F.3d at 1125. Not only did the ALJ (and the Appeals Council) rely on these outdated assessments, but the ALJ then compounded this error by allowing extra accommodations within Plaintiff's RFC without any medical evidence to support the ALJ's perception that the accommodations could actually accommodate Plaintiff's new, significant impairments. The Appeals Council then adopted these accommodations within the RFC.

The Commissioner argues that by granting plaintiff the option to sit or stand at will, the ALJ accommodated Plaintiff's hip impairment; by limiting climbing and exposure to unprotected heights

---

[14] In fact, troublingly, during the Administrative Hearing where Plaintiff testified for multiple pages about his need for a cane, the VE was never even asked about a cane, by either the ALJ or Plaintiff's counsel.

[15] Not only was Plaintiff's asthma existent for many years prior to the state-agency physicians' reviews, but the medical records do not indicate any asthma-related hospitalizations or other serious asthmatic events. Rather, the records largely indicate that Plaintiff's asthma was poorly controlled due to medication non-compliance (including improper technique for taking his inhalers) and living in a moldy apartment. There was at least one September 2015 note that once Plaintiff became compliant with his medication regimen, his asthma was well-controlled [R. 743-44], although later 2016 notes indicate he gets short of breath quite often and still needed his rescue inhaler multiple times per day [R. 970, 973, 977].

and moving mechanical parts, the ALJ accommodated Plaintiff's seizure disorder and associated symptoms; and by eliminating exposure to extreme cold, the ALJ accommodated Plaintiff's asthma. [Dkt. 16, p. 3.] The Commissioner (like the ALJ and the Appeals Council before her) are silent on the issue of Plaintiff's cane use. However, these accommodations are not tethered to any medical evidence. Instead, it appears the ALJ determined the significance of Plaintiff's seizure disorder, hip issues, and asthma for himself and made a non-medical determination about how to accommodate those medical issues. However, "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir.2014).

The ALJ here was not qualified or authorized to determine whether Plaintiff's seizure disorder or hip problems (or asthma or cane usage) would not have affected his ability to perform light work jobs that required occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs, and frequent exposure to unprotected heights, moving mechanical parts, extreme cold and vibration, even if these jobs required the opportunity to alternate sitting and standing at will. *See Stage*, 812 F.3d at 1125. Nowhere does this appear more true than with Plaintiff's asthma. Although we have already ruled that Plaintiff's post-2014 asthma flare-ups would not qualify on their own as a new, significant medical issue requiring an updated state-agency review, it is incongruous the Commissioner now argues that limiting Plaintiff's exposure to extreme cold would have accommodated his asthma because 1) the ALJ and Appeals Council did *not* limit Plaintiff's exposure to extreme cold – in fact, the RFC contains language that Plaintiff can *frequently be exposed* to extreme cold, and 2) the medical records indicate Plaintiff's asthma tends to be *worse* in the cold. If the ALJ and the Appeals Council intended to limit Plaintiff's exposure to extreme cold to accommodate his asthma, they did the opposite through this RFC.[16]

In short, the ALJ and the Appeals Council should not have relied on the outdated assessments

---

[16] In light of Plaintiff's seizure disorder that often manifests itself headaches, dizziness, and fainting, it also seems contradictory that Plaintiff's RFC allows for frequent exposure to unprotected heights.

13

of Drs. Gotcanco and Bilisky when forming the RFC in this case because of the new, significant medical diagnoses in the roughly 400 pages of medical records that post-date the reviewing physicians' assessments. *Moreno*, 882 F.3d at 728; *Brewer v. Berryhill*, 2019 WL 979249, at *8 (N.D. Ill. Feb. 28, 2019). It is likely the copious evidence submitted after both Agency reviewers' assessments could have altered their conclusions and, thus, the Decision of the Appeals Council relying on the opinions of these two state Agency reviewers is not supported by substantial evidence. A newer state Agency physician assessment should have been requested. Remand is required.

## IV. Conclusion

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. At this time, the Court offers no opinion as to Plaintiff's other alleged bases of error. Plaintiff's motion for summary judgment [dkt. 14] is granted; the Commissioner's motion for summary judgment [dkt. 15] is denied.

Entered: 5/15/2019

_____
Susan E. Cox,
United States Magistrate Judge